UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT RITCHIE, ET AL.,

       Plaintiffs/Counter-Defendants,

v.

ALVIN WILLIAMS, ET AL.,

       Defendants/Counter-Plaintiffs.

_____/

Case No. 01-71712

Honorable Nancy G. Edmunds

FILED

FEB 0 3 2003

CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

**ORDER GRANTING PLAINTIFFS/COUNTER-DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [170-1] AND DENYING DEFENDANTS/COUNTER-
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [171-1]**

This is a trademark and copyright infringement action in which the parties dispute

the ownership of a trademark and the rights to certain songs.  Defendants also filed a

complaint in state court alleging various state law violations, which plaintiffs removed to

federal court on the grounds that the claims are preempted by federal copyright law.

Now before the Court are the parties' cross motions for summary judgment.

**I.    Procedural Background**

On May 2, 2001, plaintiffs Robert Ritchie ("Ritchie") and Top Dog Records, Inc.

("Top Dog Records") filed the instant action against defendant Alvin Williams

("Williams") alleging violations of Sections 43(a) and (c) of the Lanham Act, 15 U.S.C.

§§ 1051-1127, specifically false designation of origin (Count I) and dilution (Count II).

Plaintiffs also request a declaratory judgment that there is no partnership between

Ritchie and Williams and that Williams has no interest in the name, logos, and

*187*

trademarks associated with Top Dog Records or Ritchie (collectively the "Top Dog Mark" or the "mark") (Count III).

On May 16, 2001, Williams filed a counterclaim against plaintiffs asserting that he and Ritchie jointly own the Top Dog Mark as a result of an alleged partnership agreement between them. About a month later, on June 19, 2001, EB-Bran Production, Inc. ("EB-Bran"), Bow-Wow Publishing Corporation ("Bow-Wow"), and Dog Top Publishing (a division of Bow-Wow) filed a lawsuit in the Circuit Court for the County of Wayne, State of Michigan, against Ritchie, Top Dog Records and others, alleging various state law claims.[1] Defendants allege that Ritchie executed an agreement on July 21, 1989, which granted them the rights to any songs written, published, and released by Ritchie from that date through July 21, 1993. EB-Bran, Bow-Wow, and Dog Top also claim that Ritchie breached an agreement requiring him to share half the proceeds of any artists signed to Top Dog Records. Plaintiffs removed the state court complaint to federal court on May 15, 2002, on the basis that the claims were preempted by the federal Copyright Act. The Court subsequently consolidated the action with the matter already pending before it.

Meanwhile, on November 29, 2001, plaintiffs filed an amended complaint adding EB-Bran and Bow-Wow as defendants.[2] On May 14, 2002, defendants filed a second

---

[1]In various documents provided by the parties EB-Bran is spelled "EBB-Bran" or "Eb-Bran." All references apparently refer to the same entity.
 The eight counts in defendants' state court complaint are as follows: (1) breach of contract; (2) unjust enrichment; (3) fraud and misrepresentation; (4) breach of fiduciary duties; (5) constructive trust; (6) accounting; (7) conversion; and (8) injunctive relief.

[2]In his amended counterclaim, Ritchie also added a count requesting a declaratory judgment that there is no enforceable contractual relationship between Ritchie and EB-

amended counterclaim adding Kid Rock Superstore, Inc. as a party.[3]  Defendants
allege that Kid Rock Superstore, Inc. manufactures and sells goods with the Top Dog
Mark, thereby infringing upon their interest in the mark (Count II).  In Count I of their
second amended counterclaim, defendants allege that Ritchie and Top Dog Records
are infringing upon defendants' interest in the mark; and in Count III, defendants
request a declaratory judgment that the trademark applications Ritchie filed with the
United States Patent and Trademark Office are invalid as he claimed sole ownership of
the Top Dog Mark.

On October 23, 2002, defendants filed their motion for summary judgment.
Defendants ask the Court to summarily dismiss plaintiffs' false designation of origin
and dilution claims and they seek summary judgment on their counterclaims. On
November 15, 2002, plaintiffs filed their motion for summary judgment seeking
dismissal of the claims in defendants' state court complaint.  Referencing their
response to defendants' motion for summary judgment, in which plaintiffs argue that
defendants abandoned any interest they had in the Top Dog Mark, plaintiffs also seek
judgment in their favor on all pending trademark claims.

## II.    Factual Background

Ritchie is a nationally recognized rap music artist, professionally known as "Kid
Rock."  Williams  is a local concert promoter and entertainment entrepreneur. In August

---

Bran or Ritchie and Bow-Wow.  *See* Am. Countercl. Count IV.

[3]In their motion seeking leave to amend their counterclaim, defendants also sought to
add Atlantic Records, Inc.  Magistrate Judge Thomas A. Carlson denied defendants'
request.  *See* May 1, 2002 Order [98-1].

1988, while Ritchie was a high school senior, he met Williams.  According to Williams, he began working with Ritchie the following year, helping to develop and promote the latter's career.  The specific nature of their business relationship, however, is in dispute.

Williams claims that sometime prior to February 10, 1989, he and Ritchie formed a record company, Top Dog Records and Recording, to distribute the music of Ritchie and other artists they discovered.  Williams also claims that together he and Ritchie created the logo and name for Top Dog Records.  Ritchie contends that he created the mark independently of Williams, with the assistance of a fellow high school student.

Regardless of who created the mark, Williams claims that on February 10, 1989, he and Ritchie executed a Co-Partnership Agreement in which they became equal partners in Top Dog Records and its "logos, names, and trademarks."  *See* Pls.' Resp. Ex. A.  Pursuant to the Co-Partnership Agreement, Ritchie and Williams are entitled to an equal share of the proceeds earned on artists produced under the Top Dog label. *See id*.  Ritchie, however, disputes the validity of the Co-Partnership Agreement, claiming that his signature on the document was forged.  *See* Pls.' First Am. Compl. ¶ 10D.

According to Williams, he secured financial assistance from Earl Blunt and Emmett James in early 1989 to develop and promote Ritchie and other artists for the Top Dog label.  At about the same time, Blunt and James developed EB-Bran as a music production company.  *See* Pls.' Mot. Ex. B at 20-21.  Williams signed an Assignment/Transfer of Interest on March 6, 1989, conveying his fifty percent interest in the Top Dog Mark to EB-Bran, in exchange for becoming a shareholder in the company

4

and its Vice President.[4]  *See* Pls.' Mot. Ex. C ("March 6, 1989 Assignment/Transfer of Interest").   Blunt is EB-Bran's president and James is its Chief Executive Officer.  *See* Defs.' Resp. Ex. J.

On March 6, 1989, Ritchie executed a production agreement with EB-Bran, in which he agreed to record exclusively for the company for a specified period of time.  *See* Pls.' Mot. Ex. D.  On the same date, Ritchie and EB-Bran executed a supplement to that agreement (the "Supplemental Agreement"), in which Ritchie agreed to help recruit artists for Top Dog Records, in exchange for half the net revenue generated from those artists.  *See* Pls.' Resp. Ex. N.  Thereafter, on March 22, 1989, Ritchie, Williams, James, and Blunt filed a Certificate in Wayne County, Michigan, stating their intent to conduct business under the name "Top Dog Records and Recording" (the "Certificate").  *See* Defs.' Resp. Ex. C.  Williams states that after March 1989, he and EB-Bran made extensive efforts to promote Ritchie and Top Dog Records, including hiring Wesley Blunt, Earl Blunt's son, to revise the Top Dog logo.  *See* Defs.' Mot. Ex. B.

Defendants state that on March 23, the day after the parties signed the Certificate, the "Top Dog Records and Recording partnership" (allegedly comprised of Ritchie, Williams, Blunt, and James) transferred its "sole ownership" of the Top Dog Mark to EB-Bran.  *See* Defs.' Resp. at 7.  According to defendants, Blunt, as authorized representative of Top Dog Records and Recording, and Williams, as Vice President of

---

[4]Blunt and James are EB-Bran's only other shareholders.

EB-Bran, signed an "Assignment/Transfer of Interest" to accomplish the exchange. *See id.* Ex. M.

On or before June 13, 1989, EB-Bran retained Attorney Gregory Reed ("Reed") to place Ritchie with a major recording company. Approximately two weeks later, on June 26, Reed placed Ritchie with Jive Records and EB-Bran and Jive Records executed a Recording Agreement. *See* Pls.' Resp. Ex. E. The Recording Agreement provides that Jive Records will print "Company's 'Top Dog' logo . . . on the labels" of albums recorded by Ritchie. *See id.* at 10 ¶ 4.2(b)(i)(A). When the Recording Agreement was signed, Ritchie executed an inducement letter in which he agreed to provide Jive Records with his exclusive recording services. *See* Defs.' Mot. Ex. H. By signing the inducement letter, Ritchie also acknowledged that "[a]ll of the obligations, warranties and undertakings covenants and agreements on the part of the Company contained in the Agreement which concern me or Company are true and correct." *See id.* at 61 ¶ 1(c).

As part of Ritchie's placement with Jive Records, Bow-Wow and Jive Records entered into an agreement on June 26 with respect to the publishing rights to Ritchie's songs (the "Co-Publishing Agreement"). *See* Pls.' Mot. Ex. F. The Co-Publishing Agreement required Bow-Wow and Ritchie to execute an exclusive songwriter agreement (the "Songwriter Agreement"), which they immediately executed that same day. *See* Pls.' Ex. F at 8 ¶ 5(a); Defs.' Second Resp. Ex. C.[5] Pursuant to the

---

[5]Defendants filed one brief in response to plaintiffs' motion for summary judgment on December 19, 2002, and a second responsive brief on December 23, 2002. Defendants did not seek the Court's permission to file two briefs (containing a total of thirty pages). Defendants' second response is the first brief they have filed in this case which clearly explains their claims, including all the facts and documents upon which they rely. As such, the Court will need to refer to it to make sense of this matter and thus did not strike it.

Songwriter Agreement, Ritchie sold, assigned, and transferred to Bow-Wow his rights in and to any musical compositions that he created during the "Term" of the agreement. *See id.* at 1 ¶ 1.  The Term of the Songwriter Agreement commenced the week of July 21, 1989, and continued "for a period that coincides with the a [sic] major record company." *See id.* at 2 ¶ 6.  Paragraph 6 of the Songwriter Agreement, however, also provided Bow-Wow "three (3) options period [sic], to be exercised by written notice sent to writer within thirty (30) days prior to the termination of the initial term of this agreement, to extend this agreement for an additional term of fifty-two (52) weeks . . ." *See id.*

On March 8, 1990, before Ritchie recorded any albums for Jive Records, he wrote Barry Weiss, Jive Records' president, indicating that he was terminating his relationship with EB-Bran.  *See* Pls.' Mot. Ex. I.  Ritchie sent another letter to Jive Records on December 17, 1990, again stating that he was ending "any professional relationship I had with them [EB-Bran] in the past." *See id.* Ex. M.  In this letter, Ritchie stated that "EB-Bran Productions can no longer provide the services required for *Production, Management, Publishing* or any other area of my entertainment career." *See id.* (emphasis added).  Jive Records immediately forwarded Ritchie's December 17 letter to EB-Bran, seeking a response and "confirmation of the situation." *See id.* Ex. N.  Jive Records also sent Ritchie a letter indicating that while it understood he no longer was being represented by EB-Bran, it expected him to fully perform his obligations as set forth in the inducement letter.  *See id.* Ex. O.  Jive Records also copied this letter to EB-Bran.  On December 20, 1990, Jive Records wrote Ritchie an additional letter stating

that it henceforth would "treat[] the Recording Agreement and the Publishing

Agreement [initially signed by EB-Bran] as if you were signed directly and personally to

Zomba ab initio." *See id*. Ex. P.  Jive Records sent EB-Bran a copy of this letter as

well.

Defendants initially did not respond to any of these correspondences.  On March

18, 1991, however, their attorney, Eleanor Cattron-Smith, wrote Ritchie that EB-Bran

was exercising its "Second renewal option as provided in [Ritchie's] 20% management

contract."[6]  *See id*. Ex. Q.  Ms. Cattron-Smith further stated that Ritchie's "continued

refusal to honor this contract will result in legal proceedings to remedy this breach" and

that he "will be personally liable for any monies paid" to his new management company.

*See id*.  Defendants threatened to sue Ritchie if he failed to respond within ten days.

*See id*.  Ritchie did not respond.  Defendants, however, decided not to file suit at that

time, but instead decided to "wait."  *See* Pls.' Mot. Ex. B at 83.

In the meantime, Ritchie finished recording his first album, "Grits Sandwiches for

Breakfast," which Jive Records released on December 11, 1990, with the Top Dog

Mark on the label.  On March 4, 1991, Jive Records sent a letter to Ritchie's attorney

indicating that it would not be exercising its option to continue the Recording and Co-

Publishing Agreements.  *See* Pls.' Mot. Ex. X.  Jive Records sent a second letter to

Ritchie's attorney on May 14, 1991, confirming its decision and clarifying that pursuant

to the terms of the Recording and Co-Production Agreements, the agreements

nevertheless continued until September 11, 1991.  *Id*.; *see also* Pls.' Mot. Ex. E at 54

---

[6]Defendants had terminated their relationship with Reed in July 1990.  *See* Pls.' Mot.
Ex. J.

8

(defining Term of Recording Agreement) and Ex. F at 4 (defining Term of Co-Production Agreement).  To this day, however, Jive Records continues to sell copies of "Grits Sandwiches for Breakfast" with the Top Dog Mark on the label.  *See* Defs.' Resp. Ex. H.

On May 17, 1991, Ritchie entered into a recording contract with Continuum Records.  *See* Defs.' Second Resp. Ex. I.  Ritchie recorded at least one album with Continuum, "The Polyfuze Method," which was released in 1992.  *See id.* Ex. L.  This album contains nineteen songs to which defendants claim ownership.  *See* Defs.' Second Resp. at 5.  Defendants also claim that they own the songs on "Grits Sandwiches for Breakfast."  *See id.*

On September 30, 1993, Ritchie filed Articles of Incorporation in the State of Michigan, forming "Top Dog Records, Inc." and naming himself as sole owner.  *See* Second Am. Countercl. ¶ 33(a).  According to defendants, Continuum filed for bankruptcy on September 22, 1995.  On August 15, 1998, Top Dog Records and Continuum's estate entered a Transfer of Rights Agreement pursuant to which Top Dog Records purchased the rights to all songs created by Ritchie during his contract with the record company.  *See* Defs.' Second Resp. at 7.

On October 15, 1997, Top Dog Records and Atlantic Recording Company ("Atlantic") entered into a recording agreement.  Thereafter, Ritchie recorded a number of albums under Atlantic's label including "Fire It Up" (released in 1994), "Early Morning Stoned Pimp" (released in 1996), "Devil Without A Cause" (released in 1998), and "The History of Rock" (released in 2000).  *See id.* Ex. L-O & Ex. R.  Some of the songs on

these albums were initially released on "The Polyfuze Method." *See id*. Ritchie also introduced other artists who signed on to Top Dog Records to Atlantic for recording services, such as Matt Shafer (p/k/a "Uncle Kracker"), Freddie Beauregard (p/k/a "Paradime"), and Joseph Calleja (p/k/a "Joe C"). *See* Defs. Second Resp. at 7-8 & Ex. S.

Meanwhile, after Ritchie terminated his relationship with EB-Bran, Williams and Blunt went into the home construction business. *See* Pls.' Mot. Ex. B at 8-9 & Ex. S at 7-9. Thereafter, EB-Bran and Bow-Wow apparently conducted no business until at least 2000. Neither company filed any corporate records with the State of Michigan from 1990 through 2000. *See* Pls.' Mot. at 7. And plaintiffs state that neither company produced any corporate documents for that period either. *See* Pls.' Mot. at 7. Defendants did file annual reports for those years on May 11, 2001, nine days after Ritchie filed his case. *See id*. Ex. R.

Defendants, however, claim that Bow-Wow and EB-Bran remained active from 1990 through 2000. To support their claim, defendants rely on the annual reports that ultimately were filed, the continual release of "Grits for Breakfast," and two posters which they claim EB-Bran developed to promote two new artists. *See* Defs.' Mot. at 3 & Ex. K and J. The Top Dog Mark was included on these posters. *Id*.

On August 19, 1999, Ritchie applied for federal registration of the Top Dog Record name. *See* First Am. Compl. ¶ 9. He filed an additional trademark application for the Top Dog Record logo on September 1, 1999. *See id*. On April 23, 2001, attorney Reed sent a letter to counsel for Top Dog Records stating that Williams claimed an ownership

10

interest in the Top Dog Mark and that Ritchie's trademark applications therefore were fraudulent. *See id.* ¶ 10.  Apparently a few months earlier, on January 3, Williams had filed a certificate in Wayne County, Michigan, indicating his intent to conduct business in Michigan under the name "Top Dog Records." *See* Pls' First Am. Compl. Ex A.

## III.   Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323.  Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255.  The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant."  *See id.*

IV.   **Applicable Law and Analysis**

A. **False Designation of Origin**

In order to prove a claim of false designation of origin under Section 43(a) of the Lanham Act, a plaintiff must establish the following: (1) ownership of a specific mark; (2) continuous use of the mark; (3) establishment of a secondary meaning if the mark is descriptive; and (4) a likelihood of confusion amongst consumers due to the contemporaneous use of the parties' marks. *See Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991).  Whether there is a likelihood of confusion is determined by weighing several factors, including: (1) the strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degrees of purchaser care; (7) defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines.  *See Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982).

A party which has abandoned a mark cannot thereafter claim trademark protection.  Pursuant to Section 1127 of the Lanham Act, there are two occurrences which lead to a mark's abandonment.  The first, which is relevant here, occurs as follows:

> When [the mark's] use has been discontinued with intent not
> to resume such use.  Intent not to resume may be inferred
> from circumstances.  Nonuse for 3 consecutive years shall
> be prima facie evidence of abandonment.  "Use" of a mark
> means the bona fide use of such mark made in the ordinary
> course of trade, and not made merely to reserve a right in a
> mark.

15 U.S.C. § 1127.  In order for a party to succeed on a claim of abandonment, it must

prove non-use and an actual intent to abandon the mark.  *See Kellogg Co. v. Exxon*

*Corp.*, 209 F.3d 562, 575-76 (6th Cir. 2000)(citations omitted).

Defendants request summary dismissal of plaintiffs' false designation of origin

claim, arguing that plaintiffs cannot prove the first element of their claim as EB-Bran is

the "undisputed owner" of the Top Dog Mark and it never abandoned its interest in the

mark.  For those reasons, defendants also seek judgment on the trademark

infringement claims in their counter-complaint.  Defendants also contend that plaintiffs

cannot establish their false designation of origin claim because they fail to offer

evidence of confusion or interference with good will.

Plaintiffs respond that EB-Bran's ownership of the Top Dog Mark actually is

disputed.  Furthermore, plaintiffs argue, EB-Bran abandoned any interest it may have

held in the mark.  Plaintiffs argue in the alternative that laches bars defendants from

bringing their trademark infringement claims, because EB-Bran waited too long to

assert its interest in the mark.

Defendants attempt to establish EB-Bran's ownership of the mark through two

competing theories.  First, defendants claim that EB-Bran acquired a 75% interest in

the mark through Williams.  Second, they assert that EB-Bran gained sole ownership of

the Top Dog Mark from the "Top Dog Records and Recording partnership," which they allege was created when Ritchie, Williams, Blunt, and James executed the Certificate.

As to defendants' first theory, Ritchie contests the authenticity of the Co-Partnership Agreement through which Williams allegedly acquired his interest in the Top Dog Mark.  Ritchie thus raises a genuine of material fact as to whether Williams ever held any interest which he then could convey to EB-Bran.  But even assuming that Ritchie in fact did sign the agreement, it only gave Williams a fifty percent interest in the Top Dog Mark.  Obviously Williams only could transfer the same interest to EB-Bran when he signed the Assignment/Transfer of Interest on March 6, 1989.

As to defendants' second theory, the documents defendants offer to support this theory do not say what defendants claim.  Defendants assert that Reed inserted language in the March 6, 1989, Supplemental Agreement between EB-Bran and Ritchie to show that the parties (i.e. Ritchie, Williams, Blunt, and James) intended to enter into a partnership in which each partner held an equal interest in the mark.  But nothing in the Supplemental Agreement suggests this and the document otherwise fails to mention the mark or the parties' interests therein.  The inserted language merely reads, "All parties shall sign an assume name agreement." And the Certificate itself does not establish who owns what interest in the mark.  It only states that the parties intend to own, conduct or transact business under the name Top Dog Records and Recording.[7]

---

[7]Defendants maintain that the parties' execution of the Certificate on March 22, 1989, evidences  their intent to share the mark equally.  If this were their intent, why did the partnership assign its complete interest in the mark to EB-Bran the following day?

The Recording Agreement between Jive Records and EB-Bran does not undisputedly establish EB-Bran's sole ownership of the Top Dog Mark. Defendants rely on one sentence in this fifty-nine page document to prove EB-Bran's ownership. That sentence provides: "[W]ith respect to the initial United States release of Records derived from the Masters delivered hereunder, Zomba will print Company's [EB-Bran's] "Top Dog" logo or other trade symbol designated by Company (the "Symbol") on the labels of such Records." *See* Defs.' Mot. Ex. G at 10 ¶ 4.2(b)(i)(A). Defendants claim that Ritchie acknowledged EB-Bran's ownership in the inducement letter which provides, "[A]ll of the obligations, warranties and undertakings covenants and agreements on the part of Company contained in the Agreement which concern me or Company are true and correct." *See id.* Ex. H at 61 ¶ 1(c). But defendants are attempting to stretch this language way too far. For one thing, paragraph 4.2(b)(i)(A) of the Recording Agreement is not an obligation, warranty, undertaking, covenant or agreement by EB-Bran.

But even assuming that EB-Bran did acquire exclusive ownership of the mark in 1989, plaintiffs present sufficient evidence to demonstrate that the company failed to use the mark from at least 1990 through 1997. Nonuse for three consecutive years is prima facie evidence of abandonment. To rebut plaintiffs' prima facie case, defendants point to the continual release of Ritchie's first album over the last twelve years and claim that EB-Bran has used the mark to promote "several local and regional artists over the past twelve years without interruption." These examples, however, are insufficient.

15

Defendants contend that it is only through the Recording Agreement signed by EB-Bran and Jive Records that the latter is authorized to include the Top Dog Mark on the album's label.  Ritchie accurately points out that Jive Records and not defendants distributes "Grits Sandwiches for Breakfast."  Defendants are not involved with the album's continued distribution in any way.  In fact, the evidence suggests that once Ritchie indicated to Jive Records that he no longer was working with EB-Bran, Jive Records no longer considered its contract to be with EB-Bran.  In its letter to Ritchie on December 20, 1990, Jive Records stated that from then on it would be treating the Recording Agreement as if it were signed by Ritchie personally and directly, rather than by EB-Bran.  *See* Pls.' Mot. Ex. N-Q.  Jive Records subsequently sent money directly to Ritchie for his concert tour, rather than EB-Bran.  *See* Pls.' Mot. Ex. P.

Defendants only present two posters as evidence of their claim that EB-Bran has promoted artists "over the past twelve years."  There is no evidence, however,  to indicate that these posters were distributed widely, if at all.  More importantly, neither poster demonstrates defendants' use of the mark prior to 2000. The John Sadler & Friends poster states that the album advertised will be "coming September 2000" and the poster for Kenneth Breeze's album states that it will be released on July 4, 2001.[8] *See* Defs.' Mot. Ex. K.  Thus defendants fail to demonstrate that they did not abandon the mark between 1989 and 2000.  Defendants purported current use of the mark

---

[8]Plaintiffs indicate that during discovery defendants also presented an additional advertisement for "New R&B Artist Kenny Breeze – Coming Soon 1997." *See* Pls.' Resp. at 12.  Defendants, however, have not presented this advertisement to the Court.

cannot retroactively cure their past abandonment.  *See Ambrit, Inc. v. Kraft, Inc.*, 812

F.2d 1531, 1550-51 (11th Cir. 1986).

Plaintiffs, on the other hand, demonstrate ownership of the Top Dog Mark and

continuous use of the mark.  As to the other elements necessary for plaintiffs to

establish their false designation of origin claim, there does not appear to be any dispute

that the mark is distinctive and defendants concede that both parties' use of the mark

creates confusion.[9]  *See* Defs.' Mot. at 5 & Ex. N-Q.  Plaintiffs, therefore, are entitled to

summary judgment on their trademark infringement claim and dismissal of defendants'

counterclaims alleging the same.

### B. Dilution

To succeed on a dilution claim under the Lanham Act, a plaintiff must show: "'(1)

the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a

commercial use in commerce; (4) it must begin after the senior mark has become

famous; and (5) it must cause dilution of the distinctive quality of the senior mark.'"

*Kellogg Co.*, 209 F.3d at 577 (quoting *Nabisco, Inc. v PF Brands, Inc.*, 191 F.3d 208,

215 (2d Cir. 1999).  Section 43(c) of the Act sets forth factors a court may consider

when deciding if a mark is distinctive and famous.  *See* 15 U.S.C. § 1125(c)(1)(A)-(H).

And the Act defines "dilution" as

> the lessening of the capacity of a famous mark to identify
> and distinguish goods or services, regardless of the

---

[9]The statements in defendants' affidavits on this issue are telling– that is, that plaintiffs'
"use of the mark has impacted on EB-Bran's ability to market and license the mark
because people do not believe they [EB-Bran] have the right to use it based on [plaintiffs']
representations."  *See* Defs.' Mot. Ex. N-Q.

presence or absence of (1) competition between the owner
of the famous mark and other parties, or (2) likelihood of
confusion, mistake, or deception.

15 U.S.C. § 1127. Courts consider six factors in determining whether dilution is likely:

(1) the similarity of the marks; (2) the similarity of the products covered by the marks;

(3) the sophistication of consumers; (4) predatory intent; (5) renown of the senior mark;

and (6) renown of the junior mark. *See Mead Data Central, Inc. v. Toyota Motor Sales,*

*U.S.A., Inc.*, 875 F.2d 1026, 1035 (2d Cir. 1989).

Defendants seek summary dismissal of plaintiffs' dilution claim arguing that there

is no junior and senior mark at issue, but only one mark used by both parties.  For that

reason, defendants also argue that plaintiffs' mark is not distinctive.   As an initial

matter, defendants seem to misunderstand what it means for a mark to be "distinctive,"

as the term does not relate to the differences in the appearances of two competing

marks.  In fact, the stronger the similarity of the two marks, the stronger a plaintiff's

claim of dilution will be.

The marks used by the parties are identical.  And the factors set forth in Section

1125(c) indicate that Ritchie's mark is distinctive and that it has become famous.  The

Top Dog Mark has been used in connection with Ritchie and his music for over ten

years in a vast trading area.  The mark has been included on the labels of Ritchie's

records, which have been sold world-wide and which have generated millions of dollars

in sales.  The mark is displayed on merchandise sold at his concerts and on his

website.  As defendants' own affidavits indicate, people associate the Top Dog Mark

with Ritchie's music or the music of rap musicians promoted by him.

18

Defendants only began using their mark commercially in 2000 (or they only started re-using their mark at this time after abandoning it for many years). By this time, plaintiffs' mark already was famous. Defendants' mark is identical to plaintiffs and both parties use their marks to promote generally identical products, i.e. musicians and their recordings. Defendants' use of the mark thereby dilutes plaintiffs' mark by "blurring," as consumers who see the Top Dog Mark on defendants' products and advertisements most likely will think that those products and advertisements are related to Ritchie and his record company. Plaintiffs therefore demonstrate that they are entitled to summary judgment on their dilution claim.

### C. Defendants' "State Law" Claims

Plaintiffs seek summary dismissal of defendants' state law claims, arguing that the claims are barred by the applicable statutes of limitations. As defendants concede, some of these claims are preempted by the federal Copyright Act and thus its statute of limitations is applicable.

In Count I of their complaint, defendants claim breach of contract. Specifically defendants allege that Ritchie breached the Co-Partnership Agreement, the March 6 Supplemental Agreement, and the June 26 Publishing Agreement. Defendants contend that Ritchie breached those agreements by failing to share fifty percent of the net revenue generated from artists he recruited for Top Dog Records and the publishing revenue from all songs Ritchie wrote during the relevant contract. Defendants' claimed interest in Ritchie's songs and the songs written by artists recruited to Top Dog Records clearly is based in copyright.

Counts II through IV in defendants' complaint are related to their breach of contract claim. In Count II they allege that Ritchie was unjustly enriched because he failed to share Top Dog Records' proceeds with them. These are the proceeds generated by the songs written by Ritchie and other Top Dog Records' artists. In Count III defendants allege that Ritchie intentionally misrepresented that he would share those proceeds, thereby inducing defendants to enter into various agreements with him. In Count IV defendants claim that Ritchie entered into a partnership with Williams, Blunt, and James and that he breached his fiduciary duties to the partnership by establishing a competing record company which allegedly is violating the partnership's mark and copyright interests.

In their remaining counts, defendants seek relief based on their purported interest in songs written by Ritchie and other Top Dog Record artists; and thus those counts are preempted by the Copyright Act as well. In Count V defendants claim that Ritchie intentionally converted funds earned from these songs and they seek a determination that the "monies and property" be held in constructive trust. In Count VI defendants seek an accounting of the money plaintiffs earned from the songs. In Count VII defendants allege that Ritchie committed conversion by failing to "turn over" to EB-Bran and Bow-Wow the income they are entitled to receive from the songs. And in Count VIII, defendants seek injunctive relief based on the concern that Ritchie will continue to wrongfully misappropriate the income from the songs.

A cause of action under the Copyright Act must be commenced within three years after the claim accrued. 17 U.S.C. § 507(b). The Second Circuit has held that a copyright claim accrues "when a plaintiff knows or has reason to know of the injury

20

upon which the claim is premised" or "when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right. *See Johnson v. Berry*, 171 F. Supp. 2d. 985, 989 (E.D. Mo. 2001)(citations omitted). State law claims for breach of contract, fraud, unjust enrichment, and accounting, as well as some breach of fiduciary duty claims, must be brought within six years of when those claims accrue.[10]   *See* M.C.L.A. § 600.5807(8); *Miller v. Magline, Inc.*, 256 N.W.2d 761, 774 (Mich. App. 1977)(discussing statutes of limitations for breach of fiduciary duty claims); *Prine v. Hatfield*, 145 N.W.2d 809, 810 (Mich. App. 1966)(stating that statute of limitations for an accounting is six years). The statute of limitations for a conversion claim is three years. *See Brennan v. Jones*, 626 N.W.2d 917, 919 (Mich. App. 2001); M.C.L.A. § 600.5805(9).

Defendants argue that their claims only accrued in 2000, when plaintiffs filed their lawsuit. According to defendants, they only discovered then that Ritchie and other Top Dog artists released songs while Ritchie was under contract with Bow-Wow and EB-Bran. Plaintiffs contend that defendants' claims accrued in 1990, when Ritchie expressly repudiated his association with EB-Bran and thereby breached his agreements with defendants.

The undisputed evidence establishes that in October 1990 defendants knew Ritchie wrote and finished recording "Grits Sandwiches for Breakfast." *See* Mot. Ex. K. In early December 1990, Jive Records informed defendants that a release date for the

---

[10]Michigan provides two different statutes of limitations for breach of fiduciary duty claims, depending on the harm: a six year period under the general provision of Section 600.5807, and a shorter two or three year period under M.C.L.A. Section 450.1541a(4). *See Miller*, 256 N.W.2d at 774.

album would be forthcoming.  *See id.* Ex. L.  Defendants' assertion that they only discovered the existence of the remaining songs in dispute when plaintiffs initiated this lawsuit also is contradicted by the evidence.  Those songs were initially released on Ritchie's second album, "The Polyfuze Method."  "The Polyfuze Method" was released in 1992.  Defendants contend that their publishing and production agreements with Ritchie remained in effect through 1993, as a result of Bow-Wow's and EB-Bran's exercising their renewal options.  Defendants cannot claim that they were unaware of the album's release, when they claim that Ritchie still was under contract with them.

But even so, the Court should find that defendants' claims accrued well before that time when Ritchie terminated his relationship with them.  Ritchie's letter to Jive Records on December 17, 1990, which Jive Records forwarded to defendants, clearly stated that Ritchie no longer intended to work with defendants with respect to "Production, Management, *Publishing* or any other area of [his] entertainment career."  *See* Pls.' Mot. Ex. M (emphasis added).  Defendants knew, or at least should have known, from this letter that Ritchie did not intend to share any royalties from "Grits Sandwiches for Breakfast" or any subsequently released albums.  Through his actions, Ritchie repudiated defendants' interests in and ownership of his future work.  In fact after "Grits Sandwiches for Breakfast" was released, defendants' attorney wrote Ritchie that "[y]our continued refusal to honor this contract will result in legal proceedings to remedy this breach."  *See id.* Ex. Q.  Defendants decided not to pursue their claimed interest in Ritchie's songs at that time, but instead chose to "wait."

In their response to plaintiffs' motion for summary judgment, defendants state that they are alleging copyright infringement claims as well as claims of copyright ownership.

Infringement claims, unlike claims of ownership, accrue every time an infringement occurs.  *See Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 202 (4th Cir. 1997); *Zuill v. Shanahan*, 80 F.3d 1366 (9th Cir. 1996).  Defendants claim that plaintiffs infringe upon their copyright interests whenever Ritchie releases albums (or licenses others to release albums) that contain songs Ritchie originally wrote, recorded, and/or published while under contract with Bow-Wow.  According to defendants, Ritchie was under contract with Bow-Wow when he released "The Polyfuze Method" in 1992.

There is no dispute that Ritchie has re-released songs from "The Polyfuze Method" during the last ten years.  Defendants, however, still had to file their infringement claims within three years of each infringing action. As defendants filed their complaint in state court on June 19, 2001, any claims for infringement prior to June 19, 1998, are time barred.  Of the albums containing songs originally released on "The Polyfuze Method," only "Devil Without a Cause" and "The History of Rock" were released in 1998 or thereafter.[11]

Defendants' infringement claims based on Ritchie's release of these two albums therefore are not time barred.  But defendants' claims fail if they cannot establish ownership of the songs originally released on "The Polyfuze Method." Defendants premise their ownership of those songs on Bow-Wow's and Ritchie's Songwriter Agreement.  Defendants contend that the Songwriter Agreement remained in effect through July 21, 1993.  There is no evidence, however, to support this assertion.

---

[11]"Devil Without a Cause" contains one song that Ritchie previously released on "The Polyfuze Method."  *See* Defs.' Second Resp. Ex. L and Ex. O.  "The History of Rock" contains four songs from Ritchie's earlier album.  *See id*. Ex. L and Ex. R.

According to paragraph 6 of the Songwriter Agreement, its term commenced the week of July 21, 1989, and continued for a period coinciding with the parties' agreement with "a major record company," unless Bow-Wow exercised its options to extend the contract thirty days prior to its termination.  The Co-Publishing Agreement between Bow-Wow and Jive Records terminated on September 11, 1991. Defendants contend that Bow-Wow exercised its options to extend the Songwriter Agreement and as proof they offer two letters that EB-Bran's attorneys allegedly sent Ritchie on March 18, 1991 and March 15, 1992.  *See* Defs.' Second Resp. Ex. E. Neither letter, however, refers to the Songwriter Agreement.

The first letter defendants offer refers only to a "20% management contract."[12] The introductory paragraph of the second letter states that EB-Bran is exercising its "**third** renewal option, under paragraph 2 of the contract between [Ritchie] and Ebb-Bran Productions dated March 6, 1989."  *See id.* (emphasis in original).  While the second letter subsequently states that EB-Bran is continuing "the term of your Songwriter and Co-Publisher Agreement," EB-Bran was not a party to the Songwriter Agreement and thus the option did not run to it.  Furthermore, as there is no evidence to demonstrate that the agreement initially was extended before the termination of the initial term on September 11, 1991, EB-Bran's attempt to exercise the option in March 1992, was ineffective.

_____

[12]The court also finds that this letter was not referring to the Songwriter Agreement, as it states that EB-Bran is exercising its "Second renewal option."  Clearly the Songwriter Agreement was not yet due for a second renewal in March 1991.  In fact, it is impossible for the court to determine to which contract defendants' counsel is referring, as none of the agreements introduced in this case thus far would be due for a *second* renewal at that time.  Nor do any of the agreements create a "20% management" deal.

In conclusion, defendants' copyright ownership claims, state law claims, and any claims of infringement based on Ritchie's release (or re-release) of songs prior to June 19, 1998, are barred by the applicable statutes of limitations.  Defendants' copyright infringement claims relating to Ritchie's re-release of songs from "The Polyfuze Method" on "Devil Without a Cause" and "The History of Rock" are not time barred.  As the Term of the Songwriter Agreement expired prior to Ritchie's release of "The Polyfuze Method, however, defendants cannot establish their ownership interest in the songs on that album and thus their remaining infringement claims fail as well.

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Plaintiffs/Counter-Defendants' motion for summary judgment [170-1] is **granted**;

Defendants/Counter-Plaintiffs' motion for summary judgment [171-1] is **denied**.

Nancy G. Edmunds
U. S. District Judge

FEB 03 2003
Dated: _____

PURSUANT TO RULE 77(D), FRCivP
COPIES HAVE BEEN MAILED TO ALL
ATTORNEYS FOR ALL PARTIES ON
_____FEB 03 2003____ 20____.
_____
DEPUTY CLERK